(No. 5882— )

VIRGINIA E. RINEHART, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 2, 1977.*

LEON G. SCROGGINS, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

Claimant, Virginia E. Rinehart, filed suit on behalf of herself and as guardian for children born to her and her deceased husband, Ben Jonas Rinehart.

Ben Jonas Rinehart died on December 6, 1969, while a patient at Alton State Hospital at Alton, Illinois. He had been a patient there on at least 13 other occasions and had entered the last time as a voluntary patient some time before Thanksgiving in 1969.

He worked, when he was able to do so, selling Family Record Plans and American Albums.

He was first hospitalized in 1959. On December 5, 1969, the deceased became very restless, pushing patients' beds around the hospital and causing considerable disturbance. There were approximately 32 beds in the dormitory.

He finally became so objectionable that he was restrained. He was placed in his bed and his hands tied with cloth to the bedposts. There is conflicting testimony as to whether or not his legs were also tied and it appears from the record that they were. He was still very noisy causing considerable commotion. The aides then called a doctor who was on duty relative to giving him a sedative.

The record indicates that at approximately 2:00 a.m. he was given an injection of Amytal. He had been given the same sedative the night before. After the sedative was administered, he became subdued.

The record further indicates that he was quiet until he was observed at about 5:30 a.m. breathing very heavily, and he died at approximately 7:00 a.m.

An autopsy was performed and an analysis made of his brain by Dr. Frank F. Fiorese of Elmhurst, Illinois. He was the Chief Toxicologist for the State of Illinois.

From his examination of the brain, the doctor testified that he found 3.47 milligrams of Seconal per one hundred grams of brain, which is 3.47 times a lethal dose, and by calculation established that the body had 2.08 grams of Seconal in the system.

When asked approximately how much of the injectable form would be necessary to reach the quantity of 2.08 grams, the doctor replied, "If I recall well, an injectable Seconal consists of two hundred fifty milligrams; so in order to reach that concentration in the body, about two grams, I feel at least eight vials of

Seconal containing two hundred fifty milligrams each." When asked how many tablets would have had to be taken, he replied, "Let's assume that we are dealing with one hundred milligram tablets. To reach two grams, about two grams, we would need about twenty tablets, twenty-one tablets."

Dr. Ricardo Heath, who testified at the coroner's inquest, stated that he treated Mr. Rinehart the night he died. He stated that he prescribed 7-1/2 grains of Amytal at about 2:00 a.m. the morning of December 6. When asked if he had ever prescribed Seconal for Mr. Rinehart, the doctor replied, "No, I have never prescribed Seconal for any patient or Mr. Rinehart." He further stated that the Amytal came in ampules which contained powder, and this is put in a solution with distilled water and injected, and stated that the Seconal came in capsules which was not injectable.

The nurse on duty and the nurse's aide are both emphatic in their testimony as to the sedative that was given which, according to their statements, was Amytal.

It appears that all of the drugs are locked in a cabinet and a key has to be obtained when any of them are to be removed for purposes of administering them to a patient. The testimony of both the nurse and the aide was to the effect that they took the Amytal out, broke the capsule it was in, mixed it with water, and then injected it into the patient. The record is devoid of any other sedative being given to the deceased.

We, therefore, have a situation where the deceased, according to testimony given by the attendants, was bound by his hands and legs from approximately 1:00 a.m. to the time of his death so he would have been unable to administer any drugs to himself, either orally or by injection.

According to the toxicologist, the Seconal would have had to have been taken by the deceased three or four hours before his death, and it is clear from the evidence that he was unable to do this himself.

It was also established from the evidence that any drugs patients may have when they come into the institution are taken from them and given to the pharmacist.

The question of how the lethal dose of Seconal got into the system of the deceased remains one of pure conjecture as there is no evidence of any kind or character of Seconal being administered to the deceased. The record discloses only one injection of Amytal.

The toxicologist did not find any Amytal in the body of the deceased, but he stated this was not unusual because it has the propensity to absolve and disappear rather rapidly so it could not be determined from his examination whether Amytal had been received by the deceased.

There exists several possibilities as to where the lethal dose of Seconal came from:

1. The dose which was suppposed to have been Amytal could have been Seconal through a mistake in packing or on the part of those administering it;

2. Seconal given by another inmate—which seems rather far-fetched; or

3. The deceased administered the drug to himself which seems highly improbable, if not impossible, unless it was administered before 1:00 a.m., the time when he was subdued, because after that time he was physically unable to give himself the drug.

Claimant's theory is that of *res ipsa loquitur,* or, the facts speak for themselves. According to Claimant's

theory, someone on behalf of Respondent made an error that resulted in the death of the deceased. Circumstantial evidence is being relied upon by Claimant as there is no direct evidence to sustain her position.

The fact that the drug, according to the toxicologist, must have been administered after the patient was subdued strengthens Claimant's position that an error was made when Seconal was mistakenly administered to the deceased instead of Amytal, or that someone somehow administered Seconal to the deceased. In any event, the deceased did die of a tremendous amount of Seconal.

The attendants in the hospital testified at considerable length to the care that is used in storing and handling drugs and stated that at all times these drugs are kept under lock and key and, before being used, a direct order by the doctor in charge has to be made to the nurse who then secures a key from a third party, removes the desired drug, mixes it, and administers the same. There is a constant check and a running inventory made of the drugs used by this department.

Testimony was that all Seconal in the cabinet were accounted for and none were missing, which adds further mystery to the question as to where the drug actually came from.

The Supreme Court of Illinois in *Edgar County Bank and Trust Company vs. Paris Hospital, Inc.,* 57 Ill.2d 298, 312 N.E.2d 259, stated: "Much has been written in recent years on the question of the applicability of the doctrine of res ipsa loquitur to medical malpractice and hospital negligence cases." Our examination of these articles, and the authorities collected in the annotations, leads us to conclude that much of the difficulty encountered in the cases arise from the failure to recog-

nize that the application of the doctrine of res ipsa loquitur does not affect the necessity or manner of proof or proximate cause, and that it is relevant only to the nature of the proof from which the trier of fact may draw an inference of negligence. In *Metz vs. Central Illinois Electric and Gas Company,* 32 Ill.2d 446, 207 N.E.2d 305, the Court stated:

When a thing which caused the injury is shown to be under the control or management of the party charged with negligence and the occurrence is such as in the ordinary course of things would not have happened if the person so charged had used proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care. This in essence is the doctrine of res ipsa loquitur, and its purpose is to allow proof of negligence by circumstantial evidence when the direct evidence concerning cause of injury is primarily within the knowledge and control of the defendant.

No reason appears why, given the appropriate state of facts, the doctrine is not applicable to an action involving medical malpractice and hospital negligence.

The testimony in this case indicates that the decedent, Ben Rinehart, was under complete control of the Respondent. The testimony also indicates that on the morning of his death he was completely restrained by the hands and feet and could not have taken any pills by himself or injected any substance into his body. The incident would not have occurred without some form of negligence on the part of Respondent and, finally, the Respondent made no attempt to explain how the lethal dosage of Seconal got into the system of the deceased.

The record is clear that for several years the earnings of the decedent were very limited and that the family lived on Public Aid and outside income other than that furnished by the deceased. The facts would indicate that his earning power would decrease rather than increase in the future and that any contributions he might have made to the family would have been minimal. It is also apparent that he had been admitted

to the hospital thirteen times in the past and, in growing older, his chances for improvement were very small.

An award is hereby granted to Claimant in the amount of Seven Thousand Five Hundred Dollars ($7,500.00).